UNITED STATES *v.* NIPPON CO. ET AL. (No. 4478)[1]
NIPPON CO. ET AL. *v.* UNITED STATES (No. 4479)

[1] C. A. D. 303.

United States Court of Customs and Patent Appeals, March 5, 1945

*Paul P. Rao*, Assistant Attorney General (*Alfred A. Taylor, Jr.*, special attorney of counsel), for the United States.
*Lawrence & Tuttle* (*George R. Tuttle* of counsel) for Nippon Co. et al.

[Oral argument December 6, 1944, by Mr. Taylor and Mr. Tuttle

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges

BLAND, Judge, delivered the opinion of the court:

These cases are cross-appeals from a judgment of the United States Customs Court, Third Division, ruling on five protests filed by the several importers involved herein against the action of the collectors at the ports of Los Angeles, Calif., and Portland, Oreg., in classifying certain seaweeds and assessing them with duty at the rate of 35 per centum ad valorem under paragraph 775 of the Tariff Act of 1930 as "Vegetables * * * prepared."

Two principal classes of merchandise are covered by the protests— nori and konbu—both of which are forms of dried seaweed or sea moss. Both nori and konbu, however, are known by several different trade names. Counsel for the importers states in his brief that there are actually four forms of seaweed involved in the instant importations, all the nori being considered as one form, consisting of chopped small seaweeds (though known by different names), while the konbu may be grouped into three forms. Motozori konbu, it is stated, is a thick, relatively wide kelp; daishi konbu, similar to motozori but narrower; and oboro konbu, shredded or shaved kelp.

In the protests the chief claims of the importers were that these dried seaweeds were free of duty either as crude seaweeds under paragraph 1722 or as kelp under paragraph 1705. Alternative claims were made that the importations were dutiable at 10 per centum ad valorem under paragraph 1540 as seaweeds manufactured; at no more than 25 per centum ad valorem under paragraph 5 as chemical compounds; or at 10 or 20 per centum ad valorem under paragraph 1558, providing for nonenumerated articles. At the trial and here, however, the claims under paragraphs 5 and 1558 were not urged.

The pertinent portions of paragraphs 775, 1540, 1705, and 1722 of the Tariff Act of 1930 read as follows:

PAR. 775. *Vegetables* (including horseradish), if cut, sliced, or otherwise reduced in size, or if reduced to flour, or if parched or roasted, or if pickled, or packed in salt, brine, oil, or *prepared or preserved* in any other way and *not specially provided for* * * * 35 per centum ad valorem * * *.

PAR. 1540. Moss and sea grass, eelgrass, and *seaweeds,* if *manufactured* or dyed, 10 per centum ad valorem.

PAR. 1705. Kelp [free].

PAR. 1722. Moss, *seaweeds,* and vegetable substances, *crude or unmanufactured,* not specially provided for [free]. [Italics ours.]

It appears from the decision and judgment of the trial court that all the merchandise known as konbu was held to be free of duty under paragraph 1705 as "Kelp"; whereas, all the merchandise known as nori was held to be dutiable at 10 per centum ad valorem under paragraph 1540 as "seaweeds * * * manufactured" (with the exception of ajitsuki nori, as to which the trial court held that the evidence did not overcome the presumption of correctness of the collector's classification, which holding is not challenged in the importers' appeal, and that merchandise is accordingly not before us).

In appeal No. 4478 the Government has appealed from so much of the judgment as holds the konbu to be free of duty under paragraph 1705 and the nori to be dutiable at 10 per centum under paragraph 1540, contending that all the merchandise is properly dutiable as assessed by the collector under paragraph 775. In appeal No. 4479 four of the five importers have cross-appealed from so much of the judgment as holds the nori to be dutiable at 10 per centum under paragraph 1540, contending that it should be free of duty as crude or unmanufactured seaweeds under paragraph 1722.

Testimony was taken at three ports of entry, Los Angeles, Seattle, and Portland, and the cases arising on the various protests were consolidated. Further testimony was taken at San Francisco and New York. Altogether, 18 witnesses testified on behalf of the importers and 3 on behalf of the Government. The testimony of the importers' witnesses deals, in large part, with the methods of production and the use of the imported merchandise; that of the Government's witnesses relates principally to tests and analyses performed in the customs laboratories upon samples of the imported merchandise to determine the presence of an added chemical substance, monosodium glutamate. It is upon the alleged addition of that substance that the Government, for the most part, bases its contention that all the instant merchandise is properly dutiable as "Vegetables * * * prepared."

The trial court very carefully and extensively reviewed the evidence in its opinion, and therefore no useful purpose would be served in unduly extending this opinion by an exhaustive restatement thereof.

Many of the importers' witnesses had lived in Japan, and some of them had actually participated in the production of nori and konbu. Nori is produced in different parts of Japan, and, in respects which we regard as immaterial, the process of production varies in certain localities. The record, as a whole, shows it to be produced as follows: Poles or dried brush containing limbs are set in the bed of a stream, usually where salt and fresh water meet, and allowed to remain for

2 or 3 months. Slime gathers thereon, and sea moss or sea-weed collects and grows on the poles or brush. Some of the exhibits show that the seaweed is a very thin, fragile, delicately leafed plant. At the end of this period the seaweed is taken from the poles, brought to shore, cut or chopped into small pieces, and placed in tubs of fresh water, where various forms of sea sediment are washed out. It is dipped from the tubs with a square dipper, the shape and size of which conform to that of the screen or sudare upon which the material is placed and allowed to dry in the sun. One of the witnesses testified that at the time the material is sheeted on the screens, it is so mixed with water that it is "like paper pulp." As the drying continues, the mass becomes thinner and more compact. When finally dry, the sheets are taken from the screens, doubled and folded, and arranged 10 sheets to a package, which package is then sealed for shipment. Some of the exhibits representing the nori are packed and sealed (not hermetically) in tin containers 6 x 8 x 1½ inches. Others are packaged in various sized paper containers. The thin sheets are almost transparent, and a number of the sheets are carefully super-imposed upon one another in the package. Since the sheets are very thin, the material is easily crumbled to an almost powdery consistency.

So far as the use of the product is concerned, the evidence shows that it is sometimes roasted and wrapped around rice and then eaten. On other occasions it is used in making soups, or is broiled, or pow-dered and sprinkled over rice to season it. Some of the witnesses testified that the material is cooked before eating, and one witness stated, "I eat it sometimes in this fashion [in the condition imported] in order to bring out the real flavor. You have to roast it."

As to the konbu, that known as motozori and that known as daishi are pieces of seaweed which are merely folded when first taken from the ocean and then dried, the motozori being the larger leaves at the bottom of the plant and the daishi the smaller leaves at the top. "Konbu," it was testified, is the Japanese word for "kelp." The oboro or tororo konbu, the evidence shows, is made by scraping or shredding shiroita konbu or aoita konbu. All the forms of konbu are apparently used chiefly, if not exclusively, in the making of soups, for flavoring purposes. In the case of the konbu, as in the case of the nori, the Government contends that the substance, monosodium glutamate, was added.

The trial court, with reference to the controverted addition of monosodium glutamate, stated that it was of the "opinion that the record is not sufficient to establish that the Government chemists did not find monosodium glutamate in the exhibits." It held, how-ever, that the substance was merely a flavoring or seasoning and would not cause the importations to fall within the prepared vege-

table classification. It intimated that the addition of the substance might be sufficient to deprive the merchandise of classification as crude or unmanufactured seaweed; and partly on that basis, and partly on the basis of the chopping, cutting, and other operations performed upon the nori, it held that the nori was properly dutiable as "seaweeds * * * manufactured," because it had been subjected to the said manufacturing operations. As to the konbu, the trial court stated that it is a product different from nori and found from the evidence that it is a kind of seaweed known as "kelp." In view of the provision for kelp, without limitation, in paragraph 1705 of the free list, the court held, on the authority of our decision in *Centennial Flouring Mills Co. et al.* v. *United States*, 29 C. C. P. A. (Customs) 264, C. A. D. 200, that all the konbu, even though monosodium glutamate had been added thereto, and even though the oboro konbu had been shaved or shredded, was properly classifiable under the kelp paragraph.

The first question which seems to us to require decision relates to the holding of the trial court that to all the imported merchandise had been added monosodium glutamate. This we think is so, because the addition of monosodium glutamate would be an important step in the preparation of the material in considering the proper classification thereof. As before stated, the trial court summarily held, after reviewing all the evidence relating to this subject, that the evidence was not sufficient "to establish that the Government chemists did not find monosodium glutamate in the exhibits."

The evidence on this question in large part consists of or relates to the testimony of Joseph V. Sample, chemist in the customs laboratory of the appraiser at New York, testifying for the Government, and of other chemists testifying for the importers, concerning various tests of the material and criticizing or supporting the findings of Mr. Sample. The importers contend that Mr. Sample's testimony cannot be relied upon because he found, in his tests, that the crystals were orthorhombic rather than monoclinic. Much scientific testimony and lengthy arguments on both sides are devoted to the technical question as to the exact shape of the crystals of monosodium glutamate and those of glutamic acid.

We have carefully considered all these arguments and the testimony of all the witnesses pertaining thereto, and we find that, regardless of any disagreement among the witnesses on the subject of the shape of the crystals in monosodium glutamate, Mr. Sample's testimony and that of the witness who supported him stand out as definitely proving that the merchandise did, at the time examined by Mr. Sample, contain the added substance. Attention has been called to the fact that the crystal analyzation referred to by some of the witnesses had reference to commercial monosodium glutamate and not to the

imported merchandise. It has furthermore been suggested that in some instances the monosodium glutamate added in Japan might have been shaken off, to some extent, from certain portions of the importations before testing. At any rate, we are not convinced that the trial court erred in its holding to the effect that to all the imported merchandise had been added monosodium glutamate.

We think it is of next importance to determine whether or not the trial court erred in holding the various nori products involved to be "seaweeds * * * manufactured." The Government contends that the nori does not respond to that term, but that if it does, then "Vegetables * * * prepared" is a more specific provision. In urging that the merchandise could not be regarded as "seaweeds * * * manufactured," the Government relies upon certain decisions of this court, some of which will be discussed hereinafter, and, at least inferentially, upon the premise that the term "manufactured," under these holdings, is synonymous with the term "manufactures of." It contends that since the merchandise is still nori, it is not a manufacture of seaweeds but that it is a vegetable (nori), that it is prepared, and that therefore it is dutiable under the prepared vegetable paragraph.

Without repeating here the various steps which took place in the preparation of the imported article, which the Government contends is so processed as to be ready to be eaten as a vegetable, it is important to consider the fact that the crude seaweed (nori), which is shown to be of a delicate, mossy texture, is cut up, washed, and, while floating in water, dipped out in such a way as to make it, owing to its consistency like "paper pulp," easily compacted and formed into thin, brittle, almost transparent sheets, when dried and treated as above described. Manufacturing processes have been applied to the article in such a way as to wholly destroy its original form and structure and to make it advanced in condition for use as a condiment, or for cooking in various ways, or, in some instances, for eating as imported. In order to complete the preparation of the material and to give it proper flavor, somewhere in the process of its preparation, monosodium glutamate was added. Surely these steps must be regarded as manufacturing steps, and such as would remove the material from its crude state, although, under well-settled authority not necessary to repeat here, the material still remains seaweed.

Contrary to the contention of the Government, it has long been the consistent holding of this court that Congress has usually, in the enactment of tariff statutes, made a distinction between the manufacture of a thing and a thing manufactured. It must be conceded that some of the decisions of this court on this question support the contention of the Government.

In *Ishimitsu* v. *United States*, 11 Ct. Cust. Appls. 186, T. D. 38963,

it was held that seaweed known as nori tsukudani, put up in shoyu sauce in hermetically sealed tins, was not "seaweeds * * * manufactured," the court stating, "It has not been manufactured into anything different than what it first was, namely, a food product." In discussing the issue, the court treated the term "manufactured" as synonymous with the term "manufactures of."

To the same effect is the implication in *Togasaki & Co. et al.* v. *United States*, 12 Ct. Cust. Appls. 463, T. D. 40667, although, in deciding the question, the court took the position, without reviewing the question, that the *Ishimitsu* case was *stare decisis* of this issue and proceeded to determine whether or not the involved nori tsukudani, which had been cut into pieces, cooked with shoyu and sugar, placed in tin cans, again boiled, and the cans then hermetically sealed, responded to the term "Vegetables * * * prepared."

We have examined all the decisions of this and other courts relating to this subject matter but have found none in which the issue of relative specificity between a prepared vegetable paragraph and a provision for manufactured seaweeds was presented and decided.

Whatever may be said of the holdings in the above cases, this court has, in many instances since then, after much deliberation and after consideration of all those cases, definitely distinguished between the meaning of the term "manufactured" and that of the term "manufactures of." In *United States* v. *Wilkinson Process Rubber Sales Corp.*, 22 C. C. P. A. (Customs) 60, T. D. 47051, the question was squarely presented. There it was a question as to whether a rubber sheet, upon which manufacturing efforts had been expended to remove it from its crude condition, but which was still rubber in the form of a sheet, was a manufacture of rubber or rubber manufactured. There was no provision in the tariff act for rubber manufactured, but there was a provision for manufactures of rubber. The court held that the merchandise was not a manufacture of rubber, notwithstanding the fact that it had been so processed as to remove it from the crude state, but that it was a nonenumerated manufactured product by reason of the manufacturing steps which had been applied to it. We there took pains to point out wherein Congress had distinguished between the two terms, and we gave numerous examples, one of which seems quite pertinent here. We pointed out that in paragraph 1540 there was a provision for "sea grass * * * manufactured" (the same paragraph contains the provision for "seaweeds * * * manufactured") and that in paragraph 1537 (a) there was a provision for "Manufactures of * * * sea grass." In other words, this and other examples to which we called attention illustrate that in the Tariff Act of 1930, Congress distinguished in most instances between a thing manufactured and a manufacture of that thing.

Following that case, this principle was again relied upon by this

court in *W. H. & L. D. Betz* v. *United States*, 26 C. C. P. A. (Customs) 399, C. A. D. 46. There we pointed out that "Norgine F," a compound produced from seaweeds, was more than seaweeds manufactured; that it was a manufacture of seaweeds, a chemical compound dutiable under paragraph 5.

Again, in *United States* v. *General Dyestuff Corp.*, 29 C. C. P. A. (Customs) 53, C. A. D. 170, where bleached montan wax was under consideration, this court was called upon to determine whether the importation responded to the term "mineral wax," free of duty, or whether it was a manufacture of wax. This court held that it was not entitled to free entry as a mineral wax because of the manufacturing steps which had been taken in preparing it to be used in making wax polishes, in coating and impregnating paper, etc., but that neither was it a manufacture of wax because it had not emanated from the material wax state to a new article. We held that it had been manufactured and was therefore dutiable as a nonenumerated manufactured article. After discussing the case of *Tidewater Oil Co.* v. *United States*, 171 U. S. 211, we pointed out that materials were frequently manufactured, in a tariff sense, even though they did not respond to the term "manufactures of."

During the same term of court, we held, in *United States* v. *Geo. S. Bush & Co.*, 29 C. C. P. A. (Customs) 241, C. A. D. 197, that single silk fishing lines, made by coating silk threads or strands with a composition of formalin and gelatin, were no longer silk threads or yarns but were manufactures of silk, having been dedicated to a new class of uses by the manufacturing processes. Attention was called to the distinction between a thing manufactured and the manufacture of a thing.

Finally, in *United States* v. *W. H. & L. D. Betz*, 30 C. C. P. A. (Customs) 16, C. A. D. 208, "Norgine F," a highly processed seaweed material from which alginic acid was obtained in this country, was held to be a manufacture of seaweeds and not seaweeds manufactured, because it was no longer seaweeds but a special impure compound derived from seaweeds. The court there cited some of the above cases which pointed out the distinction between a thing manufactured and a manufacture of a thing, *and it held that since there was no provision in the Tariff Act of 1930 for manufactures of seaweeds*, the "Norgine F" was properly dutiable as a nonenumerated manufactured article. Judge Hatfield, speaking for the court, said:

We are of opinion, therefore, that the involved Norgine F is a manufacture of seaweeds, and is not seaweeds, manufactured. [citing cases] * * * For a discussion regarding the distinction between a material manufactured and a manufacture of a material see *United States* v. *Wilkinson Process Rubber Sales Corp.* (cross-appeals), 22 C. C. P. A. (Customs) 60, T. D. 47051, and *United States* v. *General Dyestuff Corp.*, 29 C. C. P. A. (Customs) 53, C. A. D. 170.

Applying the principles of those cases to the instant nori product, we conclude that since it is still a seaweed, in spite of all the manufacturing efforts which took it out of the crude state, it properly responds to the term "seaweeds * * * manufactured." As to the nori, therefore, there remains but one issue to determine: Should it be classified as "seaweeds * * * manufactured" or as "Vegetables * * * prepared"? The court below held that it was not "Vegetables * * * prepared." We find it unnecessary to determine this latter question because, assuming that it is a prepared vegetable, we think that under the circumstances of this case the rule of relative specificity (which is not always controlling; see *United States* v. *Clay Adams Co., Inc.*, 20 C. C. P. A. (Customs) 285, T. D. 46078), should be applied with controlling effect here.

It will be noted that that portion of the vegetable paragraph with which we are here concerned specifies no vegetable by name, except horseradish, which is included in parentheses. The provision is qualified by the term "not specially provided for." A perusal of schedule 7 of the Tariff Act of 1930 discloses that many different kinds of vegetables are specifically provided for. Obviously some have been singled out from the catch-all provision of paragraph 775 for the purpose of special duty assessments or for the purpose of more specifically naming them so as to remove them from the said "Vegetables * * * prepared" paragraph for special treatment. In other schedules, including the free list, special provisions have been made by *eo nomine* designations for things which, in a broad sense, are vegetables or vegetable substances. In paragraph 1540, provision was made for "seaweeds, if manufactured or dyed," at a duty of 10 per centum ad valorem. The term "Vegetables * * * prepared" is very broad. It includes cooked, uncooked, canned, uncanned, and all kinds of vegetables, prepared or treated in numerous and different ways and used on the table alone or as condiments, etc. It obviously is a catch-all provision. "Seaweeds," on the other hand, is a specific term. A seaweed is a specific kind of vegetable or vegetable substance; it is *eo nomine* provided for and, in the provision in controversy, is further qualified or limited by the term "if manufactured or dyed." It is true that there are edible and nonedible seaweeds and that there are at least three, or probably a few more, varieties of seaweeds dealt in in international commerce. However, there would seem to be little room for reasonable controversy on the question as to which is the more specific of the two terms; "seaweeds * * * manufactured" is indubitably a narrower designation than "Vegetables * * * prepared."

In its brief, however, the Government contends that this issue was decided in the *Togasaki* case, *supra*, and states that "Vegetables * * * prepared" was there held to be more specific than "seaweeds * * *

manufactured." But the relative specificity of these two provisions was not there determined, because it was held, without reexamining the question, that the issue as to whether the merchandise was "seaweeds * * * manufactured" was *stare decisis* in view of the *Ishimitsu* case, *supra*. It is true that the court stated, without any discussion or assignment of reasons which brought it to that conclusion, that "It seems apparent that if the seaweed may be considered as a vegetable when thus prepared it is more specifically described as 'vegetables, if cut, sliced or otherwise reduced in size * * * or prepared in any way,' than as 'seaweed, * * * unmanufactured'." Frankly, so far as relative specificity is concerned, we can see little, if any, distinction between the terms "seaweeds * * * unmanufactured" and "seaweeds * * * manufactured"; but, inasmuch as the exact issue presented here was not decided there, we do not regard that decision as controlling on this subject.

The Government has further argued that the term "Vegetables" is a designation by use and invokes the rule, which is applicable in some instances, that a designation by use supersedes an *eo nomine* provision. A designation by use, where there is some indication, either on its face or elsewhere, that Congress intended it to supersede an *eo nomine* designation, has always been held by the courts to overcome the *eo nomine* provision. But this is usually because of the fact that the term which is held to be a designation by use is couched in such language that the intent of Congress that it shall prevail over *eo nomine* provisions is clearly indicated. The Government argues that whether a thing is a vegetable or not is dependent upon its use. It is true that the courts, in defining vegetables, have characterized them as being such as are eaten at the table and used as a food, condiment, or relish, in the same manner as things which are conceded to be vegetables are used.

Regardless of whether or not the term "Vegetables * * * prepared" is a designation by use, we are certain from a study of the provision and related provisions that Congress did not use the term with the intent that it invade other paragraphs of the tariff act and draw within it vegetables more specifically provided for. The paragraph provides for a number of articles upon which have been expended elaborate manufacturing efforts. For instance, it provides for "Vegetables * * * if reduced to flour," thus clearly indicating that said paragraph was intended to include some vegetables which had gone through elaborate manufacturing processes. But Congress did not intend, for reasons which we think are apparent, that the language used should invade such provisions as the one under consideration, "seaweeds * * * manufactured." Paragraph 775 contains the limitation "not specially provided for." In paragraph 1540, Congress *did* specially provide for "seaweeds * * * manu-

factured." We therefore must hold that the instant nori, being clearly a manufactured seaweed, should be dutiable under paragraph 1540.

We have examined all the legislative history connected with the provisions in controversy but have found nothing that affirmatively shows any intent on the part of Congress to exclude edible seaweeds from paragraph 1540 and its predecessors. Congress knew at the time of enacting the various seaweed provisions that many seaweeds were edible, and it made no distinction between those which were edible and those which were not edible.

The next question involves the tariff classification of motozori, daishi, and oboro konbu. Motozori konbu, as before stated, consists of thick, wide kelp leaves. Daishi konbu is the same, except that the leaves are narrower. Oboro konbu is shredded or shaved kelp. It cannot be logically contended that this class of merchandise, even though treated with monosodium glutamate, is not kelp. The Government contends that it should not be so classified, because it is something more than kelp—a prepared vegetable—the preparation consisting of the addition of monosodium glutamate.

Like the trial court, we are of the opinion that the addition of the monosodium glutamate does not change the article into something other than kelp. The added substance may increase the desirability of the merchandise as a food, but it is nevertheless kelp. Many articles specifically named in the tariff act may, in some manner, be treated so as to make them more desirable for a particular purpose; but, so long as they remain the articles *eo nomine* provided for without limitation, unless the congressional intent is otherwise indicated, they should be classified under the *eo nomine* provisions. Kelp being *eo nomine* provided for in the free-list paragraph 1705 without limitation, the three classes of merchandise now under consideration properly respond to that term, and the trial court committed no error in so holding.

The judgment of the United States Customs Court, insofar as it relates to the merchandise on appeal, is *affirmed*.